Good morning. We have three cases set for oral argument this morning. The first one is Eveready v. Spectrum. Are counsel ready to proceed? Please go ahead. Mr. Cooper? Thank you, Your Honor, and may it please the Court. This Court has stated time and time again that secondary considerations are never an afterthought. The Board, however, failed to give secondary considerations any thought. I'm a little surprised that you start off with secondary considerations, because I honestly didn't find the argument that you made in your reply brief in your opening brief. For starters, I'm not sure I found it in the proceedings before the Board either, but that didn't seem to be more than a whiff of an argument that was in your opening brief. In the opening brief, we raised unexpected results by way of the consumer reports. You alluded to unexpected results in the context of an argument about obviousness. I didn't see that you made the argument that you make in your reply brief and appear to be making here that the Board committed error by not addressing objective considerations. That argument was not made in the opening brief, was it? The argument was made in the context of a specific secondary consideration. But no argument was made that the Board committed error by not addressing objective considerations, correct? Your Honor, that's not correct, and the position we would take on that is, based on our questions that we raised on issue that's before this Court, is issues of obviousness. By definition, that's the four-factor gram test that would include secondary considerations, Your Honor. So you say any time you raise obviousness, you have implicitly raised objective considerations, and if objective considerations are not addressed, notwithstanding that you don't specifically request that they be addressed, that that's enough to preserve that argument? At a minimum, but also what we have here, Your Honor, is law, not just evidence. In other words, the Western District of Wisconsin decision here, finding that these secondary considerations were so strong, that spectrum, when facing this preliminary injunction motion, couldn't even rise to the lowest level of a vulnerability. That's a prior proceeding years ago. That was not the proceeding that we're reviewing. We're reviewing a proceeding coming from the Board, and I don't see, frankly, that you raised the objective considerations argument before the Board, and I'm not seeing it as an independent argument before this Court. This was raised, actually, in a motion to strike by spectrum after the briefing was completed, this very issue. That's right, and we denied the motion to strike, because normally a motions panel will not strike something from a brief. It will leave it to the merits panel to decide whether or not the argument has been raised, and I put to you that I'm not seeing that it was raised. It was raised on page six of our appeal brief to the Board. There was an identification of the secondary considerations, and right after the sentence, three citations. Cite me in the record on appeal, please. So it would have been appendix 2882 was the actual citation in the appeal brief, and then the evidence, there's only 16 exhibits here, Your Honor, in our appeal brief to the Board, not this appeal brief, obviously, the appeal brief to the Board, and we identified at the end of that sentence exhibits ACE. 2882 is not in our joint amendments. It's not? No. I mean, I assume you do what everybody does, which is attach numbers to a vast amount of material and then only put in here what you cite, so you didn't cite that page. Yeah, so it was originally part of the record. It's part of our motion to strike. It was identified before the Board, all three pieces of evidence, and so out of 16 exhibits we raised, three of them raised the secondary considerations. We had it by way of a declaration from Dr. White. We had the Consumer Reports article, and then thirdly we also had the Western District of Wisconsin decision, which was part of the record here, the specific citation by the court there in regards to the secondary consideration. Well, I have from your motion, I have 2882, and your response to the motion, and, again, I see that you're referring to a transcript from the proceeding before the trial court, in this case the district court, but I'm not seeing an argument made to the Board saying, Board, please take into account the following objective considerations. I'm not seeing it. Yeah, so the sentence before is the one we're citing to you, Your Honor, there. Given the state of the art, the results achieved by implementing the teachings of the 360 patent were unexpected, at least because of the battery. It goes on. But that really goes to obviousness, whether something would have been obvious at the prima facie obviousness case. It doesn't have, at least in the context in which it's presented here, it doesn't seem to suggest secondary consideration. So this is a reexamination, as we all know here. It's not just a prima facie case, as you would see with the patent application before initial exam. It's a preponderance of the evidence standard in a reexamination at all times. Therefore, the secondary considerations evidence must be analyzed at all times to determine whether more likely than not there is or is not obviousness. So there isn't a prima facie proof, and then you come back with secondary considerations. The secondary considerations are part of the analysis from moment one in a reexamination. Can I ask you another but different question about the reply brief, and in particular what's not in the reply brief? In your opening brief, if I remember right, you made two principal arguments, one having to do with the change of the makeup of the cathode material. This goes to GaN. Correct. That did not include iron disulfide. Correct. And that the argument was that the problem of gas-caused swelling in the transition metal oxide cathodes discussed in GaN, I gather everybody agreed, simply doesn't exist in the iron disulfide. And then you made another argument about the calculation of the interfacial ratio of anode to cathode. The first argument, unless I missed something, just didn't appear in your reply brief. Why? I'm not sure why it would or would not have, Your Honor, but it's a strong argument. It's the two grounds, and it goes back to what the district court actually found here, too, in Wisconsin. The GaN reference, there's two fatal problems with GaN, and the district court had GaN before it in 2008. The board had it before it again just last year. The problem, and you identified both. The first one, GaN does not disclose as a starting point iron disulfide as the cathode. Instead, it identifies SBO because this is a lithium battery that's used. Well, there's a sentence, or I guess even a paragraph, that says, you can use our invention with a bunch of different things, including iron disulfide. So the words are there, but nevertheless, you had an argument based on your expert, and to some extent, I think, not contradicted by the other side's expert, that said a skilled artist in reading that would, in fact, not be motivated to use the sub-1 AC ratio for the different cathode makeup because the problem that GaN addresses just doesn't exist in this one. And I thought there was something to that argument, and then it didn't appear in the gray brief. Just to be clear, in our gray brief versus blue brief here, because we may not have specifically erased it as in great detail, we were specifically rebutting specific arguments there with a limited amount of space. So, in other words, we're not looking in our gray brief to drop that argument. I completely agree, and I'm ready here to speak on oral argument today, that the GaN reference specifically, it cannot be a starting point, especially in view of these secondary considerations, even without the secondary considerations. Because, number one, the starting point in GaN is a completely different cathode. It's SBO, not iron disulfide. And number two, all it teaches at most is this thing called a total ratio. That's the design parameter. So the issue quickly becomes here, what a person of ordinary skill have used, switched out that total ratio into an interfacial ratio as an ordinary design parameter. And this overwhelming evidence here, including the secondary consideration, is absolutely not. Again, that's what the district court looked at, too, with respect to the secondary considerations. For example, there's copying here. EverReady's Energizer spectrum is Rayovac. Energizer comes out into the marketplace in 2002 with this device, with this patented device, has unbelievable success with it, because it has a longer battery life in view of this patented invention. Spectrum, five years later, copies. If it was so obvious in GaN to make all of these design changes, why didn't people of extraordinary skill on both sides do it years and years before? The argument here that these references from the 90s were so obvious and these design parameters, like interfacial ratio, was so obvious, that's true. The district court found that this evidence was so strong in favor of non-obviousness, in fact, here, that Spectrum couldn't even meet the vulnerability to invalidity standard, just to knock off and to deny a motion for preliminary injunction here. That's why that decision is so important here. It's not just evidence, it's law. And what happened next was if Spectrum disagreed with that decision or found legal error in it, it could have raised it to this court, it could have appealed it. It did not. It settled, it stipulated to a dismissal with prejudice, and that's where we're at today. And as this court's found before, stipulated dismissals with prejudice based on settlement is a final judgment. And, in fact, what I would submit to Your Honors, too, is that the final judgment here is so strong. Are you suggesting there's some kind of collateral estoppel that applies here? Your Honor, I am suggesting that. Well, that's the first time I've heard that argument made. I feel like I'm coming to an argument that I'm in the wrong courtroom. If it's not that, it's darn close. And the reason is it's got a persuasive effect here. In context of whether or not the interfacial ratio of less than one is an ordinary design consideration, as Spectrum argues, or we identify as a patentable invention, the context of all this evidence shows that if it was so simple, as the district court put it, a lot of people, because this is a very competitive field, all of us have AA batteries, somebody would have come up with this years and years ago in the 90s, like all these prior art references. It didn't happen. In fact, one of the prior art references here, for example, is Ledger. Ledger is an EverReady patent. The second named inventor is Jack Marple here, who's the named inventor of the 360 patent. That patent issued in 1990. Why did it take Mr. Marple, who's a person of extraordinary skill, a chemist in the battery industry, 12 years to figure this one out? And why did it take another five years before Spectrum, as the court found in Wisconsin, copied EverReady Energizer's battery? The point here is all of that evidence leads to a finding of non-obviousness, to reversal. And the bottom line is, in our briefing to the board, could we have block quoted it, highlighted it, added more into it? Just so you know, you're under your rebuttal time. Okay, I'll stop here. Good morning, Your Honor. Ms. Sterling. May I proceed? I'm Deborah Sterling on behalf of Apelli Spectrum Brands. Your Honors, the board was correct to affirm the examiner in finding these claims obvious. And my opponent raises two issues in defense of that, typically the first one being that there was an evidentiary gap between the total input ratio taught in the art and the interfacial ratio. And those words don't explicitly appear in the art. But the board concluded, and this is on page A16 after four pages of discussion, which I'll explain, that it is when you look at the input ratio in the concept of the geometry of the battery. Do you mind if I switch you away from that, which is something that concerns me more? Okay. The argument that I referred to before, the other argument in the blue brief, which doesn't appear in the gray brief, and at least there was no express abandonment of it. What evidence is there to support the motivation to take GAN, which addressed a gas-caused swelling problem? And correct me with any error I make, okay? My understanding is that GAN, because it used the silver vanadium oxide cathode, created a gas-caused swelling problem. And in that context, there was the AC ratio that solved that problem. I don't see anything in your expert testimony or expert declaration, particularly paragraph 83 on A212, that indicates why a skilled artisan would think that it would be useful to look for a similar under-1 AC ratio for a battery that doesn't have the gas-caused swelling problem, like this one, which I think is undisputed. So GAN was not so limited, Your Honor. GAN does say that... that that was one of those complete throwaway paragraphs that would not, in fact, have motivated a skilled artisan to proceed down that path. It just lists a bunch of different cathode stuff, and I don't see any contrary evidence. Well, there's contrary evidence in Dr. White's declaration, paragraph 26. Give us a page, please. Paragraph 26 on page A97 to 98. Dr. White is your expert, their expert. And the board cited to this to say, both experts agree, that there can be swelling, whether it be a silver vanadium oxide cathode or an iron disulfide cathode. Gas-caused swelling? The swelling's a little different, but they both have swelling, and GAN says to reduce the possibility of swelling, reduce the cathode. And indeed, on page A9, or sorry, not A9, A52 of your record... The first reference that you gave us was A97, did you say, to A98? Yes. I missed the numbers. A97 to A98. Right. And it's paragraph 26. Right, okay. Good, thank you. I'm sorry, go ahead. Okay. And also, if we look at A52, and that's the claims in GAN, and I think this makes it even clearer. So, sorry, claim one begins on A51, and it tells you there's a cell with an anode and a cathode and an electrolyte. I'm sorry, this is so important to me, I want to linger on paragraph 26. What in paragraph 26 says that a skilled artisan would read GAN and want to follow some GAN method to diminish a swelling caused by something quite different, which I think the paragraph indicates is quite different because it's not gaseous, it's essentially a solid deposition problem. It's a volumetric expansion, as paragraph 26 tells you. The iron disulfide has a volumetric expansion. And GAN says, and the board points to this in its findings of fact, that you would apply the same anode underbalance to avoid swelling of any form. Again, the examples are limited to silver vanadium oxide, but GAN claims a metal sulfide cathode that has an interfacial ratio of 0.68 to 0.96. We were just looking at the claims, that's on page A52. If GAN explicitly recited in its claims this metal sulfide cathode, then its invention was not considered to be just limited to silver vanadium oxide. I'm sorry, GAN recites in its claims what? In its claims. If we go through the claims, the first claim just says anode and cathode. Give me a page, please. A51 is where claim 1 is, and A52 continues. And claim 9 is really the important claim, and it depends from several claims before it that specify. Claim 3 says there's an anode to cathode capacity ratio of 0.68 to 0.96. Claim 7, which depends from that, tells you the anode's lithium. And claim 9, which depends from that, gives you options of cathodes. One of those is a metal sulfide. And the metal sulfide in paragraph 20, one of those is iron disulfide. So GAN claimed this type of battery, his concept applied across the board, and the board found that in its fact finding number 6. But GAN is not the only issue before the board. There are other references where it explicitly teaches an iron disulfide cathode, and that's never been contradicted by EverReady. Ledger and Munchie, for example, we just heard. The Ledger patent has a lithium iron disulfide battery. Munchie tells you that if you have that type of battery, you want to dispose of all of the lithium. Right, the problem, I mean, I wasn't questioning about Munchie, but that leaves two claims, 13 and 32. So assume you're correct about this, the Munchie group. That leaves, you need GAN to get at 13 and 32, which are not part of the Munchie. And they're not part of EverReady's argument. They were part of the blue argument. They just don't appear in the gray argument. Okay, I believe they just said everything rises and falls with Claim 1, essentially. But let's go to this claim. GAN, well, I've just explained. Even in GAN's claims, GAN says, GAN claims a battery. I'm sorry, did they actually say everything? They didn't use those words, but they essentially said, we're not addressing all the additional references that you used for the dependent claims because we're arguing Claim 1. Right, but they were arguing the element that's missing is in Claim 1. So the other pieces, the non-GAN references, supply a number of other things. And in the other one, and those, there are two references, right, that pick up 13 and 32. I forget what they are, two or three other references. And they're not arguing about those. But if GAN doesn't lead to a substantial evidence-supported finding of motivation combined, then you don't have a rejection that covers 13 and 32. I believe Claim 13 was cancelled in the Gray Foundation, Your Honor. 13 was cancelled? 13 was cancelled, and Claim 32 is a new dependent claim. And none of the dependent claims were argued separately. And GAN, as we just looked at GAN's claims, GAN teaches a lithium, claims a lithium-iron disulfide battery with an interfacial ratio of less than one. And following the board's arguments, or based on the fact that it's a Jelly Roll configuration, that leads to the interfacial ratio. I can't seem to find Claim 32, Your Honor. I'm sorry. Wait, pardon? I can't seem to find Claim 32 before me, but I know Claim 13 was cancelled. Everybody cancelled Claims 12, 13 through 22, I believe. Oh, sorry, it was 14. Claim 13 says fumed silica. Right, 13 was not cancelled. Yeah, sorry. That's my apology. It was 14 that was cancelled. And Claim 13 is fumed silica, not an iron disulfide cathode. So all of the claim elements were taught in the prior art, and the board relied on that substantial evidence and its underlying fact-finding to come to the conclusion of obviousness. And there's really simply a substantial evidence standard here that we're looking at, and there is substantial evidence. The board cited to Gann, the board cited to Everetti's expert, and to Spectum's expert as well. And it cited to underlying documents other references of record. The Handbook of Batteries was cited to, Pettuccini was cited to. The board relied on all of this when it was looking and trying to understand this battery chemistry, which is pretty straightforward. You have energy from an anode, energy from a cathode, and the magic happens where they face each other, this interfacial area. And that's what the board found from the substantial evidence before it. The panel has more questions? Oh, well, I could go to the secondary consideration. This is not Leo, Your Honor. This is not Leo Pharmaceuticals. What is your position on the extent to which secondary considerations are before us or were before the board? They were not before the board, and I'll explain how. Here, the examiner in the re-exam, we were in a re-examination. The examiner presented a prima facie case, and that shifted the burden to the patent owner to rebut that. And the patent owner had three opportunities before the examiner to put in evidence of secondary consideration and make an argument based on that, tying those secondary considerations to these claims. And it did not. Three opportunities. Now, it alluded to, it mentioned a consumer report. It pointed to the statement in the patent. And the preliminary injunction transcript was in the record before the board. Now, that preliminary injunction transcript, this page that is missing that was cited to you this morning, actually says that it was cited in a discussion of the prior art, not in an argument related to secondary considerations. There was never an argument articulated to the examiners or to the board. And there was certainly nothing tying that nexus to this claimed feature that everybody has patentability on, this interfacial ratio. So the argument was not made before the examiner. That's why it didn't appear before the board. And because it wasn't made before the board, that's why it didn't appear in the blue brief here. And to the extent anything was mentioned in the blue brief, it wasn't done in the context of an argument of secondary consideration. This isn't Leo. In Leo Pharmaceuticals, there was extensive testing that compared the claimed solution to the prior art solution. There was none of that testing put into evidence here. There's no teaching away. There's no claim construction issue. This is not Leo Pharmaceuticals. The board actually said in its brief that it reviewed the complete record before it. And that included this transcript. So the board read everything that was before it and still came to the conclusion, the transcript from the preliminary injunction hearing, to be clear. The board read that, and it said it did in its brief. It just didn't comment on any arguments on secondary considerations because none were made. Can I just, I'm going to sound like a broken record, but explain to me why a skilled artisan would look at GAN, read the description of why you're trying to rebalance the AC ratio to something under one, which is all about preventing lithium intercalation based on the gas swelling, and think that that was a good thing to do with a differently constituted cathode that doesn't have that problem? I believe the board points to a quote on page A11. They're fact finding six. And they say in paragraph 39 of GAN, GAN discloses, and I'll quote, for efficient utilization of silver vanadium oxide, more anode capacity is needed in the cell active component base. The same conclusion can be drawn for all other AC ratio cells. And the cells that were explicitly disclosed in GAN are ones that have an iron disulfide cathode. They likened this limiting for swelling to all of the cells that were disclosed in their patent. What page of the board's opinion were you just reading from? A11, it's page 10 of the board's opinion. It's A11 in your joint pamphlet. And it's fact finding number six. So GAN teaches you that it's applicable to the other cells taught in GAN, and one of those cells was an iron disulfide cathode. Did that answer your question satisfactorily? Perhaps. If you have no other questions, I'll just summarize. There was substantial evidence to support the board's fact finding here. And that fact finding led the board to conclude that these claims were obvious. Secondary considerations argument, in our opinion, was waived. It wasn't raised before the examiner, not before the board, and not properly before this court. And even if properly before this court, that was the first time it appeared in this record. The district court, the primary injunction transcript was on a different record, and that record wasn't fully presented to this board. The board decided on the record before it. And there was substantial evidence in that record. Now that I've read this, I want to ask you, can you explain paragraph 39 to me of GAN, which is what you were reading from A11? Paragraph 39 of GAN. 39 of GAN. That's what's quoted in paragraph 6 at A11 of the board's decision. How does that indicate that an AC ratio of less than 1 would apply to other cells? It's the last sentence. It says, this conclusion can be drawn for all other A11s. GAN discloses that for efficient utilization of silver vanadium oxide cathode, more anode capacity is needed in the cell active component balance. So now A is going up, not down. The same conclusion can be drawn for all other AC ratio cells. How does that point toward a motivation to keep the A lower than the C for the non-silver vanadium oxide cathodes? This is making a point about something, but I don't understand why it's a point about keeping A less than C. Well, the whole point of GAN is to keep A less than C. Well, you read this particular paragraph. I'm not sure that this paragraph, which is what you pointed to, is about that at all. Then I'll return to the claims, Your Honor, and point you again to the claims. Where GAN explains in paragraph 20, and you alluded to that paragraph, it lists the cathodes that can be used. And one of those cathodes is an iron disulfide cathode. In its claims, GAN claims an anode limited battery, which means a total input ratio of less than 1, and explicitly claims one with a metal sulfide cathode, that's the iron disulfide cathode. So GAN would not have claimed his invention in such a way if he thought this ratio was irrelevant to iron disulfide. Well, unless he was claiming, you know, beyond what a skilled artisan would actually understand was enabled. This is what he envisioned his invention to be. Thank you, counsel. A couple brief points here. First, just going back to the secondary considerations, one more point. Just a month ago, this court determined in Nike that any failure by the board to review secondary consideration evidence raised, and failure to address it, is at least a minimum cause for remand. In that court, the court determined, this court determined that secondary considerations, if present, must be determined, or else it is error by the board. Secondly, with respect to... Even if it's not raised. But obviously our position is that it was raised in the appeal brief before the board coming up. It's three out of our 16 exhibits, Your Honor. And to the extent that there's a sufficiency of raising issue, that's different than whether it was raised. We did raise it. It was before the board. The argument could have been whether or not we could have raised it more sufficiently. But it was there, and it could have been reviewed. And both parties argued the extensiveness of the board's decision. Indeed, in the red brief here on page six, Spectrum identified that it's after extensive briefing before the district court lost. Going to GAN, the point of the recalibration and the difficulty, all the steps you have to go through GAN to get to our claimed invention, is exactly the point of non-obviousness, not why it is obvious. For example, paragraphs 46 through 49 of GAN support the fact that those were literally throw-ins, these other cathodes that are known in the art. It's not obvious to just simply switch out a cathode like SVO with that specific total ratio in GAN to swap out SVO, you put in iron disulfide, and all of a sudden you end up with the same ratio. What do you make of essentially claim nine of GAN, which among other things claims metal sulfide as dependent on claim two, which actually claims a ratio less than one? Those are just claims. That's law. That's what they're seeking to claim. It's no explanation, though, or teaching to persons of ordinary skill in the art on how to perform the function of taking that and having it being an ordinary design consideration, a design parameter, to swap it out, and all of a sudden you end up with the same invention here. There's no evidence of that. The reason is there's no evidence here on the record either of any correlation between total ratio and interfacial ratio. Just because you have a total ratio for a specific cathode, SVO, it doesn't mean you just swap out cathodes and you have that same ratio, total ratio here. You still have to figure out the interfacial ratio. Is it the same? Is it different? That's the problem here. There are so many variables, and when you have a significant number of unknown variables here. Just a second. This argument about interfacial versus total ratios has puzzled me. It seems to me that since we all seem to agree that as a practical matter you don't want to have cathode that's not facing anode at any point, same thing with anode, you want to have the maximum amount of interfacial contact between the two, anode and cathode, and therefore wouldn't that mean that as a practical matter total is always going to be at least a pretty close proxy for interfacial? You're getting close, but not the entire chemistry basis. A chemist would say one more thing to you that's important, and that's what flips it around, that you want as much anode as possible in what the archetype is. I understand that, but for starters, just for the proposition that total is usually a pretty good proxy for interfacial. Isn't that true? No. Then why not? Why not is exactly why. What was known to persons of ordinary skill is that to the extent you want the cathode in, that's where the reactions occur, where anode and cathode come together. You want more anode. What was known at the time is the more anode, the more lithium you put in, the longer the battery life. What Mr. Marple figured out here, that's not necessarily the case. But if you have more anode, you have more total anode and more interfacial anode, do you not? Not necessarily. Why? Right. So it's the difference between surface area and volume, using sort of a simplistic example. I understood total anode takes volume into account. It's not simply surface area. And that interfacial is just a way of saying when you take the total amount of anode or cathode and you look at the portions that face one another, that's interfacial. That's technically not correct. Total ratio is literally just that. Anode, how much anode do you have? How much cathode do you have? When you say how much anode, you're talking about volume. Amounts. Amounts. Amounts. I'm talking about amounts. Okay. Amount is a function of volume. Yeah. Well, not necessarily. Mass. I understand. But it's still a function of volume. Volume is a factor into amount, right? It could be, but that's the problem. It's not just a direct correlation. If I cut the volume in half, it's going to have an effect on the amount. It could, but we don't know by how much, though. That's the problem here. And the point, too, is that you have – and that point's a good one with respect to what you're using as your cathode. Depending on which cathode you have, that amount can change completely, and that's why it's inconclusive here. It's not correlative. It's inconclusive. And what appellees argue – We're going to wrap up a little. Okay. And for these reasons, and also based on the Nike decision regarding secondary considerations, we ask that this Court reverse the Board's decision. Thank you. Let me ask you one technical question. Were the – was the factual record for the case in the record below? In other words, the underlying – it was not, Your Honor. Okay. Thank you. Thank you.